**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| STEVEN ST. FLEUR, | : | |
| | : | Civil Action No. 10-0864 (WJM) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MICHELLE RICCI, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner pro se
Steven St. Fleur
New Jersey State Prison
Trenton, NJ 08625

Counsel for Respondents
Leeann Cunningham
Special Deputy Attorney Gen.
Essex Co. Asst. Prosecutor
Essex Co. Veterans Courthouse
50 West Market Street
Newark, NJ 07102

Debra Grace Simms
Essex Co. Prosecutor's Office
50 West Market Street
Newark, NJ 07102

**WILLIAM J. MARTINI**, District Judge

Petitioner Steven St. Fleur, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Michelle Ricci and the Attorney General of New Jersey.

For the reasons stated herein, the Petition will be denied.

## I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> Briefly, on July 28, 2001, a large barbecue was held in Maplewood. Defendant and co-defendants Greg Ulysse and Fangshiyu Floxeril were at the barbecue. Emmanuel Previllon and Edner Pierre were also in attendance. A confrontation began when Ulysse entered the party and saw Previllon looking at Ulysse's girlfriend. Ulysse shouted at Previllon that he was going to kill him. Defendant was somewhere in the crowd. Ulysse then crossed the street only to return about two minutes later, bringing a group of men with him, including defendant.
>
> When the group of men returned to the party, the argument continued. Ulysse passed Florexil an automatic gun. Florexil then took a few steps toward Previllon and pushed him. Moments later, Ulysse took the gun back from Florexil and fired a shot into the air. At this point, the police arrived and everyone at the party dispersed.
>
> Reginald Fils and Emmanuel Marrow left the barbecue. They then met up with Previllon, Pierre and Andre Richmond in Irvington. Marrow returned home while Fils, Previllon, Pierre and Richmond continued on to a party at Richmond's house in Newark.
>
> Approximately forty-five minutes to an hour later, a black Pathfinder pulled up outside of Richmond's house. Fils testified that as the vehicle pulled up he could see Ulysse in the front passenger seat. Florexil, the owner of the Pathfinder, was the driver. Edson

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Sainte and defendant were the other two occupants of the Pathfinder. Ulysse signaled to Previllon with a hand wave to meet him down on the corner of Kerrigan Boulevard and Varsity Road. Richmond decided he did not want to go, however, Fils, Pierre and Previllon decided to drive to the corner in an Acura.

As Previllon got close to where the Pathfinder was parked, he began to backup the Acura. Pierre yelled, "Emmanuel, guns." Previllon panicked. The rear of the Acura hit the front of the Pathfinder. Sainte, a passenger in the Pathfinder, testified that Ulysse exited the vehicle with a gun, the same gun he saw Ulysse place in the center console after the shooting.

Pierre, who was sitting in the front passenger seat of the Acura, was shot in the head and killed while still in the car. Fils and Previllon ran from the vehicle in different directions. Fils made it to a taxi, which he took back to Irvington. Previllon was later found dead on the sidewalk.

Florexil, was shot on the left side of his back. He testified to hearing about fifteen shots. While still on the ground, he saw that defendant had a revolver in his hands.

After the shooting, Ulysse, Sainte and defendant drove Florexil to the hospital. While driving to the hospital, Sainte testified to hearing Ulysse say, "I think I hit one" and defendant responding with, "I think I got one too." Sainte also heard defendant say to Ulysse, "we got to lay low for a while."

Defendant testified that he did not have a gun at the time of the shooting and rather, upon hearing the gunshots, ran behind the Pathfinder and laid on the ground. Defendant testified that the only person he saw with a gun was Ulysse.

According to defendant, after leaving the hospital, he stopped by his house, and then he and Ulysse went to Allentown, Pennsylvania. It was common for him to go to Allentown because his son and son's mother lived there. Defendant admitted to saying "we have to lay low for a while," but testified that he was not worried about the police, but rather, that someone would come after him from the shooting.

3

Five months later, defendant was stopped while driving a motor vehicle displaying an expired inspection sticker in Allentown. Defendant produced a New Jersey driver's license with a different name. A computerized license plate check revealed that the license had been suspended by the State of New Jersey. The driver's license was seized and the vehicle impounded. However, defendant was released.

Subsequent police investigation connected defendant to the double homicide in Newark. Further investigation led to a house at Prospect Avenue in Allentown where Ulysse was located. Ulysse was arrested. Later that same day, police officers responded to another address defendant was known to frequent. There, the mother of defendant's son answered the door and gave the officers consent to search the residence. Defendant was found sleeping in the basement. He was placed under arrest. A search of the premises was conducted, which yielded a red knapsack, containing a .38 caliber revolver with five spent bullet casings and one empty chamber.

A few days later, the police searched an Acura Legend. A Bryco semiautomatic pistol was found in the vehicle. Lens Dextra, owner of the vehicle, testified he did not know how the gun got there.

Newark Police Detective Luis Alarcon, an expert in the field of firearms and ballistics examination, testified that the nine-millimeter casings found at the scene, as well as the first three projectiles tested, including one received from the medical examiner, were discharged from the Bryco semiautomatic pistol found in Dextra's vehicle. Alarcon determined that this pistol was used to kill Previllon. Alarcon further testified that the remaining five casings, as well as the other three projectiles, including one received from the medical examiner, were fired from the Smith & Wesson .38 caliber revolver found in the knapsack retrieved from the home where defendant was apprehended. Alarcon determined that this revolver was used to kill Pierre.

State v. St. Fleur, 2009 WL 2567987, *1-*2 (N.J. Super. App. Div. Aug. 21, 2009).  In addition, Florexil testified as a witness for the State, relating that he had observed Petitioner with a

revolver in his hand.  State v. St. Fleur, 2006 WL 2883078, *2
(N.J. Super. App. Div. Oct. 12, 2006).

B.   Procedural History

Petitioner and co-defendant Gregory Ulysse were charged with
conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3
(count one); two murders, of Emmanuel Previllon and Edner Pierre,
N.J.S.A. 2C:11-3a(1) and (2) (counts two and three); second-
degree aggravated assault on Reginald Fils, N.J.S.A. 2C:12-1b(1)
(count four); third-degree unlawful possession of a handgun,
N.J.S.A. 2C:39-5b (count five); and second-degree possession of a
firearm for unlawful purpose, N.J.S.A. 2C:39-4a (count six).
Another co-defendant, Fangshiyu Florexil, was charged in count
five, as well.

Florexil pled guilty to the weapons charge.  The trial of
co-defendant Ulysse was severed.  After a trial lasting several
days, a jury acquitted Petitioner of the murder of Pierre and
lesser included crimes regarding that charge, and of the
aggravated assault charge.  The jury convicted Petitioner of
conspiracy to commit murder, of the murder of Emmanuel Previllon
by conspiring with Gregory Ulysse, and of the two weapons crimes.
The trial court sentenced Petitioner to an aggregate sentence of
thirty years without parole.  Judgment was entered on September
4, 2003.

Petitioner commenced his direct appeal by filing a notice of appeal on April 26, 2004.[2]  On October 12, 2006, the Appellate Division of the Superior Court of New Jersey affirmed the conviction.  State v. St. Fleur, 2006 WL 2883078 (N.J. Super. App.Div. Oct. 12, 2006).  On October 18, 2006, Petitioner timely filed his notice of petition for certification.  The Supreme Court of New Jersey denied certification on January 12, 2007.  State v. St. Fleur, 189 N.J. 428 (2007).  Petitioner did not file a petition for writ of certiorari with the United States Supreme Court.

Petitioner filed his first state petition for post-conviction relief on February 6, 2007.  The trial court denied relief on August 22, 2007.  Petitioner appealed on November 14, 2007,[3] and the Appellate Division affirmed the denial of relief on August 21, 2009.  State v. St. Fleur, 2009 WL 2567987 (N.J.

---

[2] Pursuant to New Jersey Court Rule 2:4-1(a), the time for filing a notice of appeal is 45 days.  That time, however, may be tolled during the pendency of certain post-judgment motions, New Jersey Court Rule 2:4-3, or if a sentencing court fails to advise a defendant of the right to appeal, New Jersey Court Rule 3:21-4(h).  Here, the record presented to this Court reflects that the sentencing court did advise Petitioner of his right to appeal within 45 days after sentencing.  The record presented to this Court does not reflect, however, whether any post-judgment motions were filed.  In any event, the Court notes that the State did not contest, in state court proceedings, the timeliness of Petitioner's direct appeal nor did the Appellate Division address the issue.

[3] Once again, the record presented to this Court does not reflect whether any post-judgment motions were filed that might have tolled the time for filing a notice of appeal.

6

Super. App.Div. Aug. 21, 2009).  On October 8, 2009, Petitioner filed his notice of petition for certification and motion for leave to file the notice of petition "as within time";[4] the Supreme Court of New Jersey granted the motion on October 23, 2009.  The Supreme Court of New Jersey denied certification on December 16, 2009.  State v. St. Fleur, 200 N.J. 549 (2009).

This Petition, dated February 11, 2010, followed.  Here, Petitioner asserts the following grounds for relief: (1) there was insufficient evidence to convict Petitioner of murder and conspiracy to commit murder; (2) Petitioner was deprived of a fair trial when the trial judge explained to the jurors the meaning of "No Bill"; (3) the instruction on conspiracy to commit murder deprived Petitioner of due process; (4) the failure to charge lesser-included offenses to murder deprived Petitioner of due process; (5) trial counsel was ineffective for failing to file a motion to suppress evidence obtained during a search of the home of Theresa Eunice's mother, including a knapsack used by Petitioner and another and which contained the gun allegedly used to kill Edner Pierre, which Petitioner was acquitted of; (6) trial counsel was ineffective for failing to call Zenola Moncrease as a witness; (7) trial counsel was ineffective for failing to renew his motion to dismiss counts one and two of the

---

[4] Pursuant to New Jersey Court Rule 2:12-3(a), the notice of petition for certification would have been due on September 10, 2009.

7

indictment; (8) trial counsel was ineffective for failing to object to the jury charge on conspiracy; (9) trial counsel was ineffective for failing to object when necessary and for ceasing to act as Petitioner's advocate by filing an emergent appeal regarding the court's response to a jury question on the meaning of "No Bill"; (10) trial counsel was ineffective for failing to move for a judgment notwithstanding the verdict; (11) the cumulation of errors of trial counsel deprived Petitioner of a fair trial.

Briefing is complete and this matter is now ready for decision.

## II.   28 U.S.C. § 2254

A federal court may entertain a petition for writ of habeas corpus on behalf of a person in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein). In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)). "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." Simmons v. Beard, 581 F.3d q158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.

Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

III.  ANALYSIS

A.   Timeliness of this Petition

Here, without elaboration, Respondents assert that the Petition is untimely.  This Court disagrees.

The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d),[5] which provides in pertinent part:

> (1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
>    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[5] The limitations period is applied on a claim-by-claim basis.  See Fielder v. Verner, 379 F.3d 113 (3d Cir. 2004), cert. denied, 543 U.S. 1067 (2005); Sweger v. Chesney, 294 F.3d 506 (3d Cir. 2002).

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

Here, the factual and legal bases of all claims were known to Petitioner by the end of trial.  Thus, the only limitations period at issue is that set forth in § 2244(d)(1)(A) - one year from the date the judgment of conviction became final.

Evaluation of the timeliness of this § 2254 petition requires a determination of, first, when the pertinent judgment became "final," and, second, the period of time during which an application for state post-conviction relief was "properly filed" and "pending."

A state-court criminal judgment becomes "final" within the meaning of § 2244(d)(1) by the conclusion of direct review or by the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the

12

United States Supreme Court.  See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.  A state court's grant of leave to file an out-of-time direct appeal resets the date when the conviction becomes final under § 2244(d)(1).  Jimenez v. Quartermain, 555 U.S. 113 (2009).

Here, Petitioner's conviction became final on April 12, 2007, ninety days after the Supreme Court of New Jersey denied certification on January 12, 2007.[6]  Thus, unless otherwise tolled, Petitioner had until April 12, 2008, to file a federal petition for writ of habeas corpus.

To statutorily toll the limitations period, a state petition for post-conviction relief must be "properly filed."

>An application is "filed," as that term is commonly understood, when it is delivered to, and accepted by the appropriate court officer for placement into the official record.  And an application is

---

[6] Insofar as the record before this Court reveals, the State did not, before either the Appellate Division or the Supreme Court of New Jersey, challenge the timeliness of the direct appeal to the conviction.  Nor did either court indicate that it considered the direct appeal untimely.  Accordingly, this Court will treat the appeal as timely in determining the date when the conviction became "final" for federal habeas purposes.  See Jimenez v. Quartermain, 555 U.S. 113, 121 (2009) ("We hold that, where a state court grants a criminal defendant the right to file an out-of-time direct appeal during state collateral review, but before the defendant has first sought federal heabeas relief, his judgment is not yet 'final' for purposes of § 2244(d)(1)(A)."); Boeglin v. Ricci, Civil No. 08-4342, 2010 WL 1999519, *4, n.3 (D.N.J. May 17, 2010) (applying Jimenez to an instance in which the state had not, in state court, challenged the timeliness of a direct appeal).

> "properly filed" when its delivery and acceptance are
> in compliance with the applicable laws and rules
> governing filings.  These usually prescribe, for
> example, the form of the document, the time limits upon
> its delivery, the court and office in which it must be
> lodged, and the requisite filing fee.  In some
> jurisdictions the filing requirements also include, for
> example, preconditions imposed on particular abusive
> filers, or on all filers generally.  But in common
> usage, the question whether an application has been
> "properly filed" is quite separate from the question
> whether the claims contained in the application are
> meritorious and free of procedural bar.

Artuz v. Bennett, 531 U.S. 4, 8-9 (2000) (citations and footnote

omitted) (finding that a petition was not "[im]properly filed"

merely because it presented claims that were procedurally barred

under New York law on the grounds that they were previously

determined on the merits upon an appeal from the judgment of

conviction or that they could have been raised on direct appeal

but were not).

Where a state court has rejected a petition for post-

conviction relief as untimely, however, it was not "properly

filed" and the petitioner is not entitled to statutory tolling

under § 2244(d)(2).  Pace v. Diguglielmo, 544 U.S. 408 (2005).

This is so even where, in the alternative, the state court

addresses the merits of the petition in addition to finding it

untimely.  Carey v. Saffold, 536 U.S. 214, 225-26 (2002).

An application for state post-conviction relief is

considered "pending" within the meaning of § 2244(d)(2), and the

limitations period is statutorily tolled from the time it is

"properly filed," during the period between a lower state court's decision and the filing of a notice of appeal to a higher court, Carey v. Saffold, 536 U.S. 214 (2002), and through the time in which an appeal could be filed, even if the appeal is never filed, Swartz v. Meyers, 204 F.3d at 420-24.  More specifically, "The time that an application for state post conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law."  Evans v. Chavis, 546 U.S. 189, 191 (2006) (finding that time between denial of post-conviction relief and filing of appeal was not tolled where appeal was untimely, even where state considered untimely appeal on its merits).  However, "the time during which a state prisoner may file a petition for writ of certiorari in the United States Supreme Court from the denial of his state post-conviction petition does not toll the one year statute of limitations under 28 U.S.C. § 2244(d)(2)."  Stokes v. District Attorney of the County of Philadelphia, 247 F.3d 539, 542 (3d Cir.), cert. denied, 534 U.S. 959 (2001).[7]

---

[7] The limitations period of § 2244(d) also is subject to equitable tolling.  Fahy v. Horn, 240 F.3d 239, 244 (3d Cir.), cert. denied, 534 U.S. 944 (2001); Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999); Miller v. New Jersey State Dept. of Corrections, 145 F.3d 616, 618 (3d Cir. 1998).  The facts of this case, however, do not raise any equitable tolling issues.

Finally, "a pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court." Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (citing Houston v. Lack, 487 U.S. 266 (1988)).

Here, Petitioner properly filed his state petition for post-conviction relief on February 6, 2007, before his conviction became "final" for purposes of the federal habeas limitations period. Accordingly, none of the one-year federal habeas limitations period had elapsed prior to the filing of the state petition for post-conviction relief and the limitations period became tolled upon the filing of the state petition for post-conviction relief.

The trial court denied PCR relief on August 22, 2007. Thus, Petitioner had 45 days, or until October 6, 2007, to file his notice of appeal. Petitioner did not file a notice of appeal until November 14, 2007. Thus, the PCR proceeding was not pending (and the federal habeas limitations period was not tolled) from October 7 through November 13, 2007, a period of 36 days. The federal habeas limitations period was tolled again from November 14, 2007, through August 21, 2009, when the Appellate Division affirmed the denial of relief, and for the 20-day period for filing a petition for certification, or through September 10, 2009. Petitioner did not file his motion for leave to file a petition for writ of certification as "within time"

16

until October 8, 2009.  Thus, the PCR proceeding was not pending
(and the federal habeas limitations period was not tolled) from
September 11 through October 7, 2009, a period of 26 more days,
yielding a total of 62 days out of the one-year federal habeas
limitations period.  Cf., e.g., Moore v. Crosby, 321 F.3d 1377
(11th Cir. 2003) (leave to file an out-of-time appeal does not
"revive" the time during which no state collateral petition was
pending before the state court) and cases cited therein;
Fernandez v. Sternes, 227 F.3d 977 (7th Cir. 2000) (where state
court grants leave to pursue late appeal, the proper period of
time to exclude from § 2244(d) limitations period is "all time
between the filing of the request to excuse the default and the
state court's decision on the merits (if it elects to excuse the
default)").  Finally, the Supreme Court of New Jersey denied
certification on December 16, 2009, and this Petition was deemed
filed on February 11, 2010.  Thus, the PCR proceeding was
concluded, and the federal habeas limitations period was not
tolled during that period of 57 days, for a total of 119 days out
of the one-year federal habeas limitations period.  This Petition
is timely.  In any event, as discussed more thoroughly below, the
Petition is meritless.

B.   Jury Instructions

     Generally, a jury instruction that is inconsistent with
state law does not merit federal habeas relief.  Where a federal

17

habeas petitioner challenges jury instructions given in a state

criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process."  It is
> well established that the instruction "may not be
> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record.  In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re

Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless."  Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

Thus, even if there is "'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation.  Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009) (internal citations omitted).

19

1.   <u>The Instruction on "Conspiracy"</u>

Petitioner was charged with the murders of Emmanuel Previllion and Edner Pierre and with conspiracy to commit murder. Petitioner contends that the instruction on conspiracy to commit murder was deficient because the judge failed to name the victim who was the object of the conspiracy.

> The Appellate Division rejected this claim on direct appeal.
>
> We discern no flaw warranting our intervention in the trial court's charge to the jury on conspiracy. No objection was entered with respect to that portion of the charge or any other.

<u>State v. St. Fleur</u>, 2006 WL 2883078, *3.

Here, the Indictment did not specify that any particular persons were the object of the conspiracy to commit murder.  In discussions with counsel before the jury charge, the trial judge noted that the charge with respect to conspiracy to commit murder would not include the specific victims' names, but that the names of the victims would be discussed in the charge on the substantive counts of murder.  No counsel voiced an objection. (Tr. of June 18, 2003, at 4.)  There is no suggestion of any other deficiency in the jury charge regarding the offense of conspiracy to commit murder.  The trial judge then charged the jury as agreed with counsel.  As with the Appellate Division, this Court can discern no error with respect to the jury charge on the conspiracy count.  Certainly, even if there was an ambiguity, there is nothing in the charge to suggest "a

reasonable likelihood" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.

Petitioner is not entitled to relief on this claim.

2.   The Failure to Instruct on Lesser-Included Charges

Petitioner argues that the trial judge should have charged the jury on lesser-included offenses of manslaughter, reckless manslaughter, and passion-provocation manslaughter because the evidence showed that the victim was looking for a gun, was extremely heated, and crashed his car into the front of the vehicle occupied by Petitioner and Ulysse.

The Appellate Division rejected this argument on direct appeal.

> Also, especially in the light of defendant's emphatically stated position at trial that a charge on lesser-included crimes with respect to the shooting of Previllon should not be given, we discern no basis in the record that would have supported a trial court determination that such a charge should nevertheless be delivered.

State v. St. Fleur, 2006 WL 2883078, *3.

In Beck v. Alabama, 447 U.S. 625, 635 (1980), the Supreme Court held that, in a capital case, a trial court must give a requested charge on a lesser included offense if it is supported by the evidence.  The Court left open the question of whether instructions on lesser included offenses were required in non-capital cases.  Id.  The Court of Appeals for the Third

21

Circuit has held that trial courts must, <u>when requested</u>, charge a lesser included offense so that the jury does not convict a defendant of a crime more serious than the jury believes the defendant actually committed merely because the jury believes the defendant had some degree of involvement and does not want to set the defendant free.  <u>Vujosevic v. Rafferty</u>, 844 F.2d 1023, 1027 (3d Cir. 1988) (citing <u>Keeble v. United States</u>, 412 U.S. 205, 212-13 (1973)).  <u>But see</u> <u>Geschwendt v. Ryan</u>, 967 F.2d 877, 884 n.13 (3d Cir.) (observing that the Supreme Court, in <u>Schad v. Arizona</u>, 501 U.S. 624 (1991), cast doubt on the theory that due process always requires the court to instruct on a lesser included offense in non-capital offenses by applying a harmless-error standard; conviction of an offense two rungs higher up the ladder is a reliable indicator that a jury would not have convicted of the least included offense that was not charged), <u>cert. denied</u>, 506 U.S. 977 (1992).  Other circuits have held that the failure to give lesser included offense instructions in a non-capital case does not present a constitutional question.  <u>See</u> <u>Pitts v. Lockhart</u>, 911 F.2d 109, 112 (8th Cir. 1990), <u>cert. denied</u>, 501 U.S. 1253 (1991);  <u>Bonner v. Henderson</u>, 517 F.2d 135, 136 (5th Cir. 1975).

This Court observes that the states are free to define criminal offenses in any way they see fit, within certain constitutional limitations, even through their lower courts.

Smith v. Horn, 120 F.3d 400, 415 (1997) (citing Johnson v. Rosemeyer, 117 F.3d 104 (3d Cir. 1997)), cert. denied, 522 U.S. 1109 (1998).  Under New Jersey law, a person commits murder if the actor purposely or knowingly causes death or serious bodily injury resulting in death.  N.J.S.A. 2C:11-3(a)(1), (2). Criminal homicide constitutes the lesser-included offense of aggravated manslaughter when "[t]he actor recklessly causes death under circumstances manifesting extreme indifference to human life."  N.J.S.A. 2C:11-4a(1).  It is second-degree manslaughter if the criminal homicide is committed only "recklessly" or "in the heat of passion."  N.J.S.A. 2C:11-4b(1).  Here, state law defines passion/provocation manslaughter as a "[h]omicide which would otherwise be murder under section 2C:11-3 [that] is committed in the heat of passion resulting from a reasonable provocation."  See State v. Grunow, 102 N.J. 133, 138-40 (1986); N.J.S.A. 2C:11-4b(2).  The test for passion/provocation is an objective one.  State v. Mauricio, 117 N.J. 402, 411 (1990); see also State v. Pratt, 226 N.J. Super. 307, 317 (App. Div. 1988). There are four elements necessary to demonstrate passion/provocation manslaughter: 1) adequate provocation; 2) lack of time to cool off between provocation and slaying; 3) defendant must have actually been provoked; and, 4) defendant must not have actually cooled off before the slaying.  The provocation must be sufficient to arouse the passions of an

23

ordinary person beyond the power of his control.  State v. King, 37 N.J. 285, 301-02 (1962).  However, "a course of ill-treatment" rather than a single event can constitute adequate provocation.  State v. Guido, 40 N.J. 191, 211 (1963).

Under New Jersey law, an instruction as to a lesser offense is warranted where the facts provide a rational basis for such a conviction.  N.J.S.A. 2C:1-8e ("The court shall not charge the jury with respect to a lesser included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."); State v. Choice, 98 N.J. 295, 298-99 (1985).  However, a charge on a lesser included offense should not be given where it would invite the jury to engage in sheer speculation.  State v. Mendez, 252 N.J. Super. 155, 159 (App. Div. 1991), certif. denied, 127 N.J. 560 (1992).  In addition, "a trial court must be sensitive to the potential that charging lesser-included offenses could prejudice a defense to the more serious charges."  State v. Perry, 124 N.J. 128 (1991).

Here, it is apparent from the record that counsel made a strategic decision to request that lesser-included offenses not be included in the charge with respect to the murder of Emmanuel Previllon,[8] a permissible course of conduct under state law.

---

[8] Defense counsel did request instruction on lesser-included offenses with respect to the charge of murder of Edner Pierre, who was shot while sitting in a car and did not appear to be actively participating in the altercation.

24

This Court agrees that the proofs at trial did not require the court to instruct with respect to lesser-included homicide offenses on the charge of murdering Previllon; the proofs at trial would not have provided a "rational basis" for the jury to convict of a lesser-included offense.  Moreover, even if the state court decision were erroneous, which this Court does not find, any error did not involve "an unreasonable application" of clearly established federal law, as determined by the Supreme Court of the United States, as demonstrated by the decisions in several Circuit Courts of Appeals that instructions on lesser-included offenses need not be given in non-capital cases.

Petitioner is not entitled to relief on this claim.

3.    The Response to the Jury Question on "No Bill"

During the trial, defense counsel questioned Florexil about the fact that he had originally been charged as a co-defendant with respect to the murders, but that he had later been "no billed."

During its deliberations, the jury sent the trial judge a question:  "Are we permitted to ask what the legal term 'no bill' means?  If so, please give us the definition."  Counsel disagreed as to whether the trial judge could properly answer that question.  After hearing the positions of the parties, the trial judge answered the question, as follows:  "A no bill is a determination by the grand jury not to return an indictment."

(Tr. of June 20, 2003, at 21.)  Petitioner contends that this instruction deprived him of a fair trial.

The Appellate Division rejected this argument.

A colloquy at the conclusion of Florexil's testimony produced evidence that he, too, had been initially charged in a criminal complaint with the murders, that he had "[e]ventually ... pled guilty to possessing a gun[,]" and that he had not been sentenced yet. He responded in the negative to a question whether any promise had been made by the State in return for his testimony.

The essence of Florexil's testimony was that, at the Maplewood site, Ulysse had handed Florexil the firearm Florexil was charged with wielding. Ulysse took it back some twenty seconds later, and fired it. They then drove off together to the Newark location. When, on cross-examination, Florexil disclosed that he had initially been charged with murder, defense counsel's next question was: "And you wind up not being charged with anything except unlawful possession of a weapon, right?" That question drew a request from the State for a side bar conference.

At side bar, counsel and the court discussed the procedural history in this regard: that Florexil had been charged with the murders in a criminal complaint, but that the grand jury had eventually indicted him only for the weapon charge. During that conference, the term "no billed" was used in reference to the grand jury's action, and it was agreed that action would be disclosed to the jury. During the course of the continued cross-examination that ensued, the following colloquy occurred:

Q ... [Y]ou're familiar, by the way, that the grand jury no billed you on all the murder and conspiracy charges, right?

A Yeah.

Q So you were then left with unlawful possession of a weapon, right?

A Yes.

26

Q And you then pled guilty to that, right?

A Yes.

    The cross-examination then proceeded with defense counsel suggesting that Florexil should not be believed because he had struck a very favorable bargain with the State. The cross-examination ended with a question to Florexil that elicited a positive response: "It's no billed in the grand jury and you sit here today hoping to not even have a weapons' conviction, but PTI, right?" The theme tied in with counsel's attack in summation on Florexil's credibility.

...

    Finally, we agree with the trial judge that the jury was entitled to a response to its request during deliberations for a definition of the term "no-billed", which had come into the record on Florexil's cross-examination. The response the court gave the jury after conferring with counsel-who differed on how the court should handle the matter-was: "A no bill is a determination by the grand jury not to return an indictment." That response was simple, accurate and neutral. It gave the jury the information it had sought that would enable it to understand the testimony it had heard.

State v. St. Fleur, 2006 WL 2883078, *2-3.

When the jury requests clarification of the charge or additional instructions after beginning deliberations, the trial judge must clear away the confusion "with concrete accuracy." Bollenbach v. U.S., 326 U.S. 607, 612-13 (1946). See also Grecco v. O'Lone, 661 F. Supp. 408, 413 (D.N.J. 1987)(citing United States v. McCall, 592 F.2d 1066, 1068 (9th Cir. 1979)). "The ultimate question is 'whether the charge taken as a whole was such as to confuse or leave an erroneous impression in the minds

of the jurors.'"  McCall, 592 F.2d at 1069.  See also Martini v. Hendricks, 188 F.Supp.2d 505, 530 (D.N.J. 2002) (same).

Here, the decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was the decision based on an unreasonable determination of the facts available to the Appellate Division.  Petitioner is not entitled to relief on this claim.

C.   Ineffective Assistance of Trial Counsel

Petitioner asserts that trial counsel failed to provide constitutionally effective assistance in the following particulars:  (1) trial counsel was ineffective for failing to file a motion to suppress evidence obtained during a search of the home of Theresa Eunice's mother, including a knapsack used by Petitioner and another and which contained the gun allegedly used to kill Edner Pierre, which Petitioner was acquitted of; (2) trail counsel was ineffective for failing to call Zenola Moncrease as a witness; (3) trial counsel was ineffective for failing to renew his motion to dismiss counts one and two of the indictment; (4) trial counsel was ineffective for failing to object to the jury charge on conspiracy; (5) trial counsel was ineffective for failing to object when necessary and for ceasing to act as Petitioner's advocate by filing an emergent appeal regarding the court's response to a jury question on the meaning

28

of "No Bill"; (6) trial counsel was ineffective for failing to move for a judgment notwithstanding the verdict; (7) the cumulation of errors of trial counsel deprived Petitioner of a fair trial.

The Appellate Division rejected this claim.

To establish a prima facie claim of ineffective assistance of counsel and entitlement to a hearing, a defendant must show he has a reasonable likelihood of succeeding under the test set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984). This standard has been adopted by the New Jersey Supreme Court in State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987). The first prong of the Strickland-Fritz standard requires defendant to demonstrate that counsel's performance was deficient. Strickland, supra, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L. Ed.2d at 693. The test is whether counsel's conduct fell below an objective standard of reasonableness. Id. at 687-88, 104 S.Ct. at 2064, 80 L. Ed.2d at 693. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S. Ct . at 2064, 80 L. Ed.2d at 693. Therefore, "[a]s a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal 'except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial.'" State v. Castagna, 187 N.J. 293, 314-15, 901 A.2d 363 (2006) (quoting State v. Buonadonna, 122 N.J. 22, 42, 583 A.2d 747 (1991)).

A defendant challenging counsel's performance must overcome a strong presumption that counsel exercised reasonable professional judgment. Strickland, supra, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694-95. Furthermore, "[j]udicial scrutiny of counsel's performance must be highly deferential." Ibid. This deference requires that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Ibid.

The second prong of the Strickland-Fritz test requires defendant to show that the deficient performance was prejudicial to the extent that defendant was deprived of a fair trial. Strickland, supra, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L. Ed.2d at 693. This requires a showing that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068, 80 L. Ed.2d at 698. In such cases where there is a complete denial of the right to counsel altogether, prejudice may be presumed. United States v. Cronic, 466 U.S. 648, 658-59, 104 S.Ct. 2039, 2046-47, 80 L. Ed.2d 657, 667-68 (1984).

Here, defendant argues that he received ineffective assistance of counsel because trial counsel failed to file a motion to suppress as requested by defendant. Defendant certifies that he asked trial counsel to file a motion to suppress the weapon found in the red knapsack, however, counsel never filed such a motion. The PCR judge found that the police officer's had a reasonable belief that a consenting third party, Theresa Eunice, had sufficient control over the property to consent to the search. Therefore, the judge did not find trial counsel ineffective for not filing a motion to suppress. We agree. Because the search was not illegal, but pursuant to valid consent, defendant does not meet the first prong of the Strickland-Fritz standard.

Defendant also argues that trial counsel failed to call witness Zenola Moncrease to testify on his behalf. The PCR judge rejected defendant's argument, finding that neither prong of the Strickland-Fritz test was satisfied.

The Supreme Court has found that "[d]etermining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320, 877 A.2d 1183 (2005). Therefore, the decision at trial as to what witness's to call is "clearly a matter of trial strategy which is entrusted to the sound discretion of competent trial counsel." State v. Coruzzi, 189 N.J.Super. 273, 321, 460 A.2d 120, certif. denied, 94 N.J. 531, 468 A.2d 185 (1983).

30

It is far from clear that Moncrease's testimony would have exculpated defendant. Moncrease stated that she did not see who fired the shots into the Acura nor did she see anyone actually get struck by the gunfire. Rather, Moncrease said that she only heard the shots going off. Her statement that she heard the gunfire as the two men exiting the passenger side of the Pathfinder ran past the Acura does not disprove that defendant was the shooter.

Moreover, even if trial counsel was deficient in not calling Moncrease as a witness, defendant still has not proven that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L. Ed.2d at 698. Defendant was acquitted of the murder of Edner Pierre, who was the victim shot with the gun found in defendant's knapsack. Defendant was found guilty of conspiring with Ulysse to commit murder and for the murder of Previllon who was shot by Ulysse. Therefore, Moncrease's testimony would not have changed the outcome of the trial as it would not have affected defendant's conviction for conspiracy or murder.

Defendant also argues trial counsel failed to renew his earlier motion to dismiss counts one and two of the indictment at the end of the defense case. The PCR judge rejected defendant's argument. We agree that a motion for a judgment of acquittal at the close of all evidence would not have been successful.

Here, defense counsel filed a motion for judgment of acquittal on the murder and conspiracy counts at the close of the State's case. We rejected on direct appeal defendant's argument that the judge erred in his denial of the motion.

Defendant also argues that trial counsel failed to object to the conspiracy charge. The PCR judge rejected defendant's argument, finding that defendant did not show a prima facie case. We agree.

Defendant already raised as an issue on direct appeal that the trial judge erred in providing a misleading jury instruction on conspiracy to commit murder. We rejected this argument, finding that we could "discern no flaw warranting our intervention in

the trial court's charge to the jury on conspiracy."
St. Fleur, supra, No. A-4557-03T4 (App.Div. Oct. 12,
2006) (slip op. at 7), certif. denied, 189 N.J. 428
(2007).

Defendant argues trial counsel failed to pursue an
emergent appeal of the court's proposed answer to a
jury question. The PCR judge rejected this argument. So
do we.

During deliberations, the jurors asked the court,
"[a]re we permitted to ask what the legal term 'no
bill' means? If so, please give us the definition." The
judge responded with, "[a] no bill is a determination
by the grand jury not to return an indictment."
Defendant's trial counsel objected to this response and
requested time to consider an emergent appeal based on
the judge's response. However, after delays in the
proceedings, trial counsel become frustrated with the
amount of time that had gone by and decided to withdraw
his request for an emergent application.

Defendant's appellate counsel raised the issue
before us. We determined the trial judge's "response
was simple, accurate and neutral. It gave the jury the
information it had sought that would enable it to
understand the testimony it had heard." Ibid.

Defendant argues that trial counsel failed to move
for a judgment notwithstanding the verdict. The PCR
judge rejected defendant's argument. We agree that such
a motion would not have been successful, considering
the evidence.

Defendant argues that although separately the
previous errors may have been harmless, when viewed
cumulatively, each of the alleged errors committed by
trial counsel is sufficient to require reversal. The
PCR judge rejected this argument, finding that
defendant did not state a prima facie case on any of
the claims. We agree. The cumulative error doctrine
provides that if the aggregate effect of the errors
render the trial unfair then a new trial shall be
granted before an impartial jury. State v. Orecchio, 16
N.J. 125, 129, 106 A.2d 541 (1954). "[T]he predicate
for relief for cumulative error must be that the
probable effect of the cumulative error will render the
underlying trial unfair." State v. Wakefield, 190 N.J.

397, 538, 921 A.2d 954 (2007), cert. denied, --- U.S.
----, 128 S.Ct. 1074, 169 L. Ed.2d 817 (2008). That is
not the case here.

State v. St. Fleur, 2009 WL 2567987, *5-*7.

The Appellate Division correctly identified and applied the
controlling Supreme Court standard set forth in Strickland v.
Washington, 466 U.S. 668 (1984).  Accordingly, Petitioner is not
entitled to relief on this claim.

D.   Sufficiency of the Evidence on Murder and Conspiracy

Petitioner argues that the State presented "no evidence on
the critical element that petitioner entered into an agreement
with Ulysse to commit murder."  (Petition, ¶ 12, Ground One.)

The trial judge rejected this argument when presented as a
motion to dismiss the indictment at the close of the government's
case.

    THE COURT:  First of all, in a motion such as
    this, one has to closely analyze the evidence one heard
    and match it against the elements that the State has to
    prove and then employ the standard under 3:18-1.

    Now, let's talk about the elements of conspiracy
    to commit murder.  The jury would have to find that St.
    Fleur agreed with Ulysse that they, or one of them,
    engaged in conduct which constitutes a crime or an
    attempt or solicitation of the conduct engaged in would
    purposely or knowingly cause the deaths or causing
    death or attempting to cause death or that St. Fleur
    agreed to aid Ulysse.

    And you are saying, Mr. DeMarco, you're alleging
    that the co-conspirator was, indeed, Ulysse?

    MR. DE MARCO:  Yes, sir.

33

THE COURT:  In the planning or commission of the murder, or agreed to aid Ulysse in an attempt to commit the murder.  So you have one of those two alternatives.

The second element would be that St. Fleur's purpose was to promote murder or the commission of the crime of murder, or his purpose was to facilitate the commission of the crime of murder.

Now, this is the direct and circumstantial evidence that this jury could find or the facts that this jury could find, based on the testimony I heard, that St. Fleur and Uilysse were close friends; that St. Fleur was present at the earlier party when Ulysse threatened to kill Previllion, so that the jury can fairly infer that St. Fleur was aware that Ulysse wanted vengeance; that St. Fleur was present when Ulysse shot the gun at the earlier party.

You could find that Fang shot the gun at the earlier party, but the bottom line was that St. Fleur was aware that Ulysse had a gun; that right after that violent encounter, St. Fleur left the party with his close friend, Ulysse, to go to the next destination; that St. Fleur was with Ulysse at the Kerrigan party and saw the objects of Ulysse's wrath, Previllion and his close friends; that he was present when Ulysse told Previllion to meet him at the corner because there was this one bit of testimony from one of the witnesses where that was said by Ulysse.

St. Fleur was present in the car when the car driven by Florexil backed up into the Acura.  The next thing you know, certainly that all these shots are fired and right after that, we have the evidence of Ulysse saying, or St. Fleur saying, I think I got one; and I think it was Ulysse or one of the other said, I think I got one, too, or hit one, hit one was the word.

Then you have the evidence that St. Fleur said to Ulysse, I think at the hospital, we now have to lay low, implying if you go backwards from the agreement to lay low, looking backwards to the actions and what was sowed and what was done, I think this jury could find beyond a reasonable doubt that Mr. St. Fleur -- I'm sorry, I don't want to leave out the evidence that they both went to Allentown together, but all the togetherness doesn't mean anything in the world, that's

34

just a circumstance to be taken into account, and I
don't want anybody to think I'm putting any undue
weight on those things.

St. Fleur was present at the scene.  He was a lot
more than just merely present, as I heard the
testimony, and that he was close friends with Ulysse.
So what?  They both shared the murderous intent.  In an
agreement, and as the law says, one does not -- the
jury does not have to find that there was an express
agreement.  The agreement can be implied by conduct and
words and all that was said and done.

And so even if -- so that's why I would not
dismiss the conspiracy to commit murder, or the murder.
I incorporate by reference the comments he made by the
ballistics' evidence.  ...

(Tr. of June 17, 2003, at 77-80.)

On direct appeal, the Appellate Division again rejected

Petitioner's argument.

We have analyzed the record in the light of the
issues raised on appeal and reject the arguments
offered by defendant. Ample evidence was produced from
which the jury could logically and reasonably have
inferred that defendant and Ulysse had conspired to
commit the crime of murder. We may not overturn a jury
verdict that is supported by substantial credible
evidence in the record. See State v. Landeros, 20 N.J.
76 (1955); State v. Buffa, 51 N.J.Super. 218, 235
(App.Div.1958). Focusing on the alleged conduct of
defendant and Ulysse both before and after the murder
of Previllon occurred, we agree substantially with
Judge Ravin's rationale for denying defendant's motion
to dismiss the conspiracy charge.

State v. St. Fleur, 2006 WL 2883078, *2.

A claim that the jury's verdict was against the weight of

the evidence raises a due process concern.  Only where, "after

viewing the evidence in the light most favorable to the

prosecution, [no] rational trier of fact could have found the

35

essential elements of the crime beyond a reasonable doubt" should the writ issue.  Jackson v. Virginia, 443 U.S. 307, 319 (1979). This standard must be applied "with explicit reference to the elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324, n.16.  See also Orban v. Vaughn, 123 F.3d 727 (3d Cir. 1997), cert. denied, 522 U.S. 1059 (1998).  As noted above, state court factual determinations are presumed to be correct.  See Werts v. Vaughn, 228 F.3d 178, 186 (3d Cir. 2000).

The decisions of the Appellate Division, and of the trial court on which the Appellate Division relied, are neither contrary to nor an unreasonable application of clearly established federal law, nor are they based on an unreasonable determination of facts based on the evidence before them. Petitioner is not entitled to relief on this claim.

IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims

36

or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability will issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition will be denied.  No certificate of appealability will issue.  An appropriate order follows.

s/William J. Martini

_____
William J. Martini
United States District Judge

Dated: 1/17/12